In the Matter of the Application of EDWARDS D. EMERSON et al., Constituting the BOARD OF EDUCATION OF THE CITY OF BUFFALO, Respondents, *v.* GEORGE S. BUCK et al., Constituting the COUNCIL OF THE CITY OF BUFFALO et al., Appellants.

**Buffalo (city of) — construction and application of charter (L. 1914, ch. 217) conferring power upon council of city to cut down estimates made by board of education for expenses of ensuing year — such power not affected by Education Law, as amended by Laws of 1917, chapter 786.**

1. Under the charter of the city of Buffalo (L. 1914, ch. 217) the legislative, executive and administrative powers of the city are vested in a council, consisting of the mayor and four councilmen, which has the sole power to raise by a general tax the funds necessary to carry on the city for the next fiscal year with no limit as to the amount except the provision of the State Constitution (Art. 8, § 10) that the taxes to be raised should not exceed two per cent of the assessed valuation of the real and personal estate of the city. The council also has the sole power to apportion the general fund raised by taxation but limited in amount by the constitutional provision, among the different departments, including the board of education for expenses of the schools and salaries of the teachers and other employees. While the board of education has authority to employ teachers and employees and fix their compensation and to prepare annually an estimate of the amount required for the next fiscal year, the council has the undoubted power to reduce the amount demanded by the estimate, especially where the reduction does not require the discharge of any employee or the decrease of any existing salary.

2. The statute (L. 1917, ch. 786) creating independent boards of education in cities of the state under the authority of the state department of education, created a new board of education in and for the city of Buffalo with all the control over educational matters formerly possessed by the city, except that the latter might still fix the compensation of teachers and other employees on the same basis as when the act went into effect, but it was not the legislative intention to confer upon such board the sole power to determine what proportion of the total tax levy should be used for these purposes and for other expenses of maintaining the schools. The statute of 1917 conferred upon the board of education no authority to make an estimate which the council

must accept without criticism and allow the money required to meet it, no matter how much the other activities of the city may suffer. The council still has the power to reduce the estimate of the board of education, as well as other departmental estimates, and such reductions must be accepted.

*Matter of Emerson* v. *Buck*, 194 App. Div. 81, reversed.

(Argued January 17, 1921; decided March 1, 1921.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered November 17, 1920, which affirmed an order of Special Term granting a motion for a peremptory writ of mandamus.

The facts, so far as material, are stated in the opinion.

*William S. Rann, Corporation Counsel (Hamilton Ward* of counsel), for appellants. The averments in the defendants' affidavits are to be taken as true on this application. (*People ex rel. Pompyanski* v. *Keating*, 168 N. Y. 390.) The act of 1919 does not repeal subdivision 6, section 877 of chapter 786 of the Laws of 1917. (*People ex rel. Burroughs* v. *Brinkerhoff*, 68 N. Y. 259; *Whipple* v. *Christian*, 80 N. Y. 523; *People ex rel. Strough* v. *Canvassers*, 77 Hun, 372; *People* v. *Quigg*, 59 N. Y. 88; *Matter of Commissioners of Central Park*, 50 N. Y. 493; *McKenna* v. *Edmunstone*, 91 N. Y. 31; *Parker* v. *Railroad Co.*, 165 N. Y. 274; *Wilds* v. *Peck*, 26 N. Y. 42; *Matter of Evergreens*, 47 N. Y. 216; *Matter of Railroad Co.*, 185 N. Y. 171.) The legislature has delegated to the council of the city of Buffalo the power to determine the amount of money to be appropriated by the city for educational purposes, and to the board of education the power to conduct the educational affairs and to administer the expenditure of the moneys appropriated for educational purposes subject to some supervisory powers in the financial officer of the city. (L. 1917, ch. 786; L. 1914, ch. 217, §§ 290–304; L. 1919, ch. 645.) The city

of Buffalo is not required to appropriate money for board of education purposes except in the discretion of the council and in the manner provided by section 877 of the Education Law. (*Hirschfield* v. *Cook*, 227 N. Y. 297.)

*Simon Fleischmann, Louis E. Desbecker* and *Adrian Block* for respondents. The laws of the state vest in the board of education the sole and exclusive power to fix the number and the salaries of teachers and other employees of the department of education in Buffalo. (*City of Buffalo* v. *Lewis*, 192 N. Y. 193; *Matter of Brigham* v. *City of New York,* 227 N. Y. 575.) The power to fix salaries carries with it the power to compel the appropriation of funds to meet such salaries. (*Freeman* v. *Freeman*, 126 App. Div. 603; *Town of Fort Edward* v. *H. V. Ry. Co.*, 127 App. Div. 438; *People ex rel. Hall* v. *Bd. Suprs.*, 13 Abb. N. C. 421; *Burke* v. *State*, 64 Misc. Rep. 558; *Kirby* v. *State*, 68 Misc. Rep. 626; *People ex rel. Simon* v. *Bradley*, 207 N. Y. 592.)

ANDREWS, J. As the Special Term granted a peremptory writ of mandamus on the application of the respondents, we must assume, in the consideration of this case, that every fact alleged by the appellants is true. With this rule in mind, it appears that chapter 217 of the Laws of 1914 provided a consistent scheme for the government of the city of Buffalo. Both the legislative and the executive and administrative powers of the city were vested in a council consisting of the mayor and four councilmen. Representing the city in the latter capacity, the state intrusted to it not only purely municipal functions but as its agent certain governmental duties also. Matters relating to local police, to local fire protection, to the public health and to public education were placed under its authority. These powers were to be exercised through various departments, at the head of

each of which a councilman was to be placed. One of these, the department of public affairs, included within its jurisdiction the matter of public instruction, headed by a board of education elected by the council. Under its control this board was given authority over the public schools and their expenditures. The council also chose a superintendent of schools with immediate supervision over them. He hired and discharged teachers subject, however, to the provisions of the charter and to the ordinances or regulations of the city. The terms of such teachers and their compensation were prescribed by the council. To obtain the necessary funds it prepared annually an estimate of the amount to be raised by a general tax to carry on the city government for the next fiscal year. As to the amount of this estimate it was not limited save by the constitutional provision that taxes to be raised should not exceed two per cent of the assessed valuation of the real and personal estate of the city. (Art. 8, sec. 10.) Nor was any attempt made by the legislature to partition the money to be raised among the different city purposes. Had it chosen, doubtless, it might have done so. It might have required as it had done in the city of New York that a percentage should be devoted to education. It might have deprived the city of any control over this subject. It might have vested the whole authority in the state officers and provided the necessary support by state taxation, but it did not. Therefore, in making its estimate the council alone was to decide how the general fund necessarily limited in amount by the constitutional provision should be apportioned among the various objects for which it was required.

For the fiscal year beginning July first, 1920, the limit which might be raised by taxation in Buffalo was $23,885,249.12. The board of education prepared an estimate of the sum it would require for that year. It asked for $5,336,830, of which sum it stated it would

need $4,750,465 for salaries. This total was made up in great detail. Like estimates were prepared by other departments. Of all the total was $25,461,478.60. The council decided that the tax levy should be limited to $23,635,084.28. This left $250,164.83 for contingencies. It reduced these estimates made by the other departments by $1,328,164.13, as far, it claims, as it could go with due regard to the interests of the city. In doing so the estimates of some departments were fixed below the amounts granted them for 1919. Sixty-two patrolmen and seven firemen were eliminated. So were six visitors in the department of welfare. It also reduced the estimate of the board of education by $498,230. The papers before us are not as clear as we might wish as to precisely how this was done. Evidently the council took the estimates as to the salaries and reduced them by $343,929. The balance of the reduction seems to have been for items for maintenance. Its final action does not appear. We assume that it included in its budget a sum of $4,838,600 which total when raised by taxation would be paid into the city treasury to the credit of the board. In the previous year the same board had asked for $3,458,912. This reduction did not require the discharge of any employee or the decrease of any existing salary. Assuming the whole amount labeled " maintenance " was used for that purpose, it would prevent increases of salaries and the hiring of new employees for the succeeding year. Some of these new positions were to be filled by teachers. Some were not. Another chauffeur was desired and repairmen, the last a duplication of existing positions under the city government. This reduction will not cripple or interfere with the general work of the board and the amount allowed is adequate and sufficient for its purposes. No assertion is made that the council acted in bad faith.

Admitting that under the charter the council might do as it did, the board claims that because of chapter 786

of the Laws of 1917 and chapter 645 of the Laws of 1919 this power no longer exists in so far as it restricts the board as to the number of its employees and the salary they shall receive. It does concede the power as to the maintenance items. But as to the others, it is said the board may now fix such salaries and engage such employees as it may think wise. The council must then accept its estimate without criticism and allow the money required to meet it, however much the other activities of the city may suffer. In this, the state but applies to Buffalo the rule that exists in certain other localities. Therefore, the board by mandamus seeks to compel the council to include in its tax levy the full amount asked for for this purpose. At the Special Term a peremptory mandamus to that effect was granted and this order was affirmed by the Appellate Division.

The general purpose of these statutes is clear. Largely it was the intent that the state should reassume the power over education which it had hitherto given to the municipalities. By creating independent boards of education under its own authority it was thought that political entanglements might be avoided. It was believed a higher class of instruction would result by insuring teachers at least a minimum salary, by giving their appointment and the question of increased compensation to its agents, and by making their position permanent. All this was done. Those matters were left to the board. But was the power so conferred unqualified? Whatever the board chose to ask, that must the city grant? Or must it act within the limits of the appropriations made for its benefit? Who was to determine whether in any year it should use $5,000,000 or $15,000,000 — the board or the city?

Chapter 786 of the Laws of 1917 is made an article of the Education Law. So far as the city of Buffalo is concerned it created a new board with all the control

25

over educational matters formerly possessed by the city, except that the latter might still fix the compensation of teachers and other employees. Even this power, however, was not untrammeled. These salaries were to continue to be on the same basis as when the act went into effect. As we construe this last phrase the legislature itself fixes a minimum amount which must be paid them but leaves any increases in the hands of the council. The new board was to be appointed by the mayor for a fixed term subject to confirmation by the council. It then, " subject to the provisions of this chapter," conferred various powers upon it. As has been said, the board may create or abolish such positions as in its judgment might be proper and appoint such teachers and employees as it thought necessary. It may purchase necessary apparatus, furniture and supplies, may maintain and establish schools and may make ordinary repairs to existing school buildings. For any of these latter objects, it may enter into the necessary contracts after advertising for bids. Disbursements for all of these purposes are to be made by the board out of the school fund in the city treasury.

To secure the fund to be raised by taxation the board is to prepare annually and file with the officer authorized to receive other departmental estimates, exactly as such estimates are filed, an estimate of such sum as it thinks will be necessary for the purposes of paying (a) the salaries of teachers and employees, fixed as we have seen by the legislature at not less than the salaries in force when the act took effect; (b) other necessary and contingent expenses, including the purchase of supplies and ordinary repairs; (c) remodelling of existing buildings and the construction of new buildings and their equipment, and the purchase of sites, and any other expenses the board is authorized to incur. In Buffalo, however, the purchase of real estate and the erection of new buildings is still left to the council. When filed this estimate is to be

acted upon " by such officer and by the council of such
city in the same manner and with the same effect as other
department estimates." After the budget is adopted,
the total is to be included in the tax roll of the city and
the amount to be raised for its purposes is credited to
the board. The board is not to incur a liability or
expense " chargeable against the funds in its control "
for " any purpose in excess of the amount appropriated or
available therefor."

There is an apparent conflict between these various
provisions. On the one hand the board may employ
such teachers, and may make such repairs and buy such
supplies as it thinks wise. These expenses are to be paid
from the school fund and even if this fund is not suf-
ficient to meet the board's wishes it may not be exceeded.
On the other hand this fund is appropriated by the coun-
cil. To this body is submitted a detailed estimate, show-
ing the purposes for which it is needed, just as estimates
from other departments are submitted, and it acts upon
all these estimates in the same manner and with the same
effect.

The respondents seem to concede that there is still
left to the council power to revise appropriations asked
for by the board for so-called items of maintenance such
as ordinary repairs and the purchase of supplies. We
think, however, that the question of salaries and that
of maintenance must be treated on the same basis. The
board may engage such employees as it thinks wise. It
may make such repairs and purchase such supplies as
it decides are required. In each case it enters into a
binding contract. In the former the legislature fixes the
minimum salary. In the latter the board fixes the
price. If in the one case the council must appropriate
what the board says it will require, so it must in the
other.

We conclude, however, that in neither case was it the
legislative intention to confer upon the board the sole

power to determine what proportion of the total tax levy should be used for these purposes. How the council of Buffalo acts upon other departmental estimates and the effect of its action is not doubtful. It may reduce them and that reduction must be accepted, and as to this particular estimate we do not think the legislature limited what would otherwise be the meaning of this general language, and this, for several reasons.

Although if the meaning of a statute is clear, it is to be adopted by the courts regardless of results, where there is doubt these results are important as a clue to the meaning. Considering, therefore, such results, it would seem unfortunate if in a city of the size of Buffalo, a body however able and devoted, not elected, not removable by the appointing power, not even with a tax budget of its own so that its action would be brought sharply to the attention of the public, might command the allotment to it of whatever part of limited revenues it thought best to the sacrifice of other interests perhaps as essential. Such a board has no detailed knowledge of other public needs. It knows nothing of the number of police required, or of the demands to safeguard the public health. Its view is limited to its own department, of course important, but likely to be regarded as of unique importance by those who have its interests at heart. In all governments, in the nation, the state, the city, the problem is to reconcile a hundred pressing needs so that the total of the appropriations shall not be excessive. In Buffalo, at least, this may best be done by some body able to consider them all and their relative importance. Unless its intent is clear we are unwilling to say that the legislature ignored this principle.

It would also be less difficult to give the construction asked for by the respondents, had the legislature been unfamiliar with instances where it had clearly decreed this precise result. In a city of less than 50,000 inhabitants the amount of the estimate as made must be

included in the next annual tax roll without objection or question. In Lockport the amount of the estimates must be included and raised by a separate school tax. This method of administration was adopted only for the smaller cities of the state. But at least these provisions in the very act before us afforded a model if the intention had been to apply the same rule to Buffalo. Where it wished to say so, the legislature found no difficulty in using appropriate words. Certainly it was not the intention to adopt the rule universally. In certain cities of the second class the board of estimate was expressly given authority to increase, diminish or reject any item contained in the board's estimate. In New York, if the estimate exceeded a certain percentage of the tax levy, the excess is subject to the same action as are other departmental estimates.

Lastly, the provision for an estimate and for action on this estimate by the council is of controlling importance. If the amount asked for wages and expenses must necessarily be granted a detailed estimate becomes meaningless. So does the statement that the council may act upon it as it does upon other estimates. If possible, we must give force to each sentence deliberately adopted by the legislature.

Carried to extremes any interpretation given to the act ends in the ridiculous. The city might cut down the estimates of the board to a nominal sum. If so what becomes of the rule that teachers must be paid at least a certain salary and that the tenure of their positions is permanent? Or if the respondents are right, the board might demand the entire tax that the city has the right to raise. The police have a permanent tenure also. Such extreme cases are no argument for either interpretation. The legislature rightfully assumes that public officials will perform their duties in good faith and with proper regard to the interests committed to them.

We conclude that the statute of 1917 conferred on the

board no such authority as is claimed for it. The board does determine how many teachers are to be employed and what repairs made. Upon these questions it may act, confining its activities, however, within the limits which its available funds allow. But when it comes to the matter of deciding between the manifold activities of a great city, how great a proportion of its revenue might fairly be allotted to education, that is left where it had always been.

The interpretation given to the act of 1917 is the key to the situation. We regard the act of 1919 as immaterial on this subject. It relates to salaries in city schools. It raises the minimum of such salaries which the legislature had already fixed and transfers to the board the power to increase them above that minimum. Such a provision is no more inconsistent with the construction we give the act of 1917 than is the power already possessed by the board, to buy apparatus and to fix the price.

The orders of the Appellate Division and the Special Term should be reversed and the writ dismissed, with costs in the Appellate Division and in this court.

HISCOCK, Ch. J., HOGAN, CARDOZO, POUND and McLAUGHLIN, JJ., concur; CRANE, J., dissents.

Orders reversed, etc.